UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| MICHAEL TREJO, | ) | CV 14-119-AJW |
| | ) | |
| Petitioner, | ) | |
| | ) | MEMORANDUM AND ORDER |
| v. | ) | DENYING PETITION FOR |
| | ) | WRIT OF HABEAS CORPUS |
| JEFFREY BEARD, Secretary of | ) | |
| the California Department of | ) | |
| Corrections and Rehabilitation, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**Background**

Petitioner and co-defendants David Godine and Christine Ramos were charged with attempted murder and kidnaping in the commission of a carjacking. [Clerk's Transcript ("CT") 194]. The following evidence was presented at trial.[1]

1. *Prosecution evidence.*

Rebecca Tafolla testified she first met defendant Trejo

---

[1] The following summary of the evidence is taken from the opinion of the California Court of Appeal. Citations to the record are based upon this Court's independent review of the record, which confirms that the state appellate court's summary of the evidence is a fair and accurate one.

on August 30, 2008. They smoked methamphetamine and spent
the night together. The next morning they drove around in
her Honda Civic trying to obtain more methamphetamine. In
the afternoon they visited a house in Covina where Trejo
introduced Tafolla to the two sisters who lived there, Kelly
and Monique. [Reporter's Transcript on Appeal ("RT") 340-
345, 386-387].

Tafolla went home around 4:00 p.m. because she had to
babysit, but she returned to the Covina house shortly after
midnight. In addition to Trejo, Kelly and Monique, there
were now a few other people at the house, including
defendant Godine and defendant Ramos. After a while, Tafolla
drove Ramos and Trejo to a 7-Eleven store. They returned to
the Covina house, but left again to visit a friend of
Trejo's in La Puente. They stayed there only a few minutes
and then drove back to the Covina house. Someone wanted to
smoke, but Kelly and Monique said they had to do it outside,
so Trejo, Godine, Ramos and Tafolla went to the backyard.
[RT 346-355].

Godine picked up a metal baseball bat and began
swinging it at Tafolla, but he was just fooling around and
she did not feel threatened. However, she did flinch and
Trejo put his arms around her. The next thing Tafolla
remembered was waking up inside the trunk of her own car.
Her head hurt and she could taste blood. She heard Ramos say
something like, "[C]heck her to see if she has anything in
her pockets, check her." The trunk opened and Tafolla saw
Godine and Trejo standing there. When Tafolla tried to get

out of the trunk, Trejo pushed her back in. Tafolla was crying and Trejo told her to "shut the fuck up or I'm going to shoot you." He shut the trunk and Tafolla blacked out again. [RT 356-362, 395, 405, 416, 419-420, 426].

When Tafolla regained consciousness, she felt the car going fast and she heard Trejo and Ramos talking. Tafolla pushed against the trunk lid and it opened. Even though she could tell they were driving on the freeway, Tafolla threw herself out of the car and onto the roadway because she was afraid the defendants were going to kill her. She did not recall hitting the ground, but she remembered getting up, walking off the freeway and finding a 7-Eleven. She was crying and bleeding all over. Someone called the police and Tafolla was taken to the hospital, where she remained for a week. She had fractures to one ear, abrasions to her arms, and her broken jaw had to be wired shut for a month. When Tafolla's car was recovered, it had been set on fire and burned. [RT 361-365, 375, 382-384].

Kelly testified she lived at her parents' house in Covina. On the weekend of this incident, she invited some friends over because her parents were out of town. Trejo arrived in the late afternoon and introduced her to Tafolla. Godine showed up later with Kelly's brother Mark. Kelly testified Tafolla was in and out of the Covina house several times. Tafolla and Trejo went to the 7-Eleven at one point. Around midnight, the defendants were at the house along with Tafolla, Kelly, Monique and Mark. Several times, Kelly heard Trejo say "he was going to kick [Tafolla's] ass" and that

"he was going to beat her and hold her hostage for her car."
Kelly testified she was scared about "what [Trejo] was
planning," so she told everybody they had to leave. [RT 358-
359, 453-463, 477, 508-509].

    "Q. Okay. And when you say 'what he was planning,' what
did he – I don't want you to guess at what he was planning
– what did he tell you he was going to do?

    "A. Well, that he was going to beat her, hold her
hostage, take her car, and by the time her parents or ...
anybody reported her missing or the car stolen, that it
would already be burned up." [RT 468-469].

    Kelly walked Tafolla to her car because she thought
Tafolla was leaving, but 20 minutes later she noticed
Tafolla's car was still outside. Kelly looked into the
backyard, where she saw Trejo and Godine. She heard the side
gate open and Tafolla say, "[W]hy are you doing this to me?"
Kelly then walked to the front door and saw Godine and Trejo
dragging Tafolla from the backyard toward her car. Ramos was
standing by the driver's door of Tafolla's car. Trejo told
Tafolla to shut up and he punched her. Kelly could see
Tafolla had been badly beaten; she was bleeding from her
head and face. Trejo opened the trunk and threw Tafolla
inside. All three defendants then got into Tafolla's car,
with Ramos driving. [RT 462-465, 469-475].

    Monique testified Tafolla went into the backyard with
Trejo at some point after midnight. Ramos was in the front
yard and Mark was apparently asleep somewhere in the house.
Monique did not know where Godine was. The side gate made a

noise and Monique saw Trejo holding Tafolla from behind. They were going toward the front of the house where Tafolla's car was parked. Tafolla was crying and Trejo told her to shut up. Monique went inside and locked the door. She heard Tafolla's car drive off. She did not see Godine or Ramos at this time. [RT 616-624, 633].

Monique was initially uncooperative with the police because she was afraid of Trejo. Eventually she told them Trejo had gotten upset that night and told everyone he was going to kick Tafolla's ass. Monique could not recall if she also told police Trejo had said he was going to hold Tafolla hostage for her car because he was tired of her. Monique denied telling detectives that, after the abduction, she cleaned up some blood on the ground and covered it with paint. [RT 635-636, 640, 647, 682].

Monique and Kelly denied being members of the West Covina Mob gang. The jury was shown a photograph of the two sisters, along with Ramos and some other girls, wearing red shirts and throwing up gang signs. Kelly explained the shirts were in remembrance of Monique's fiancé, Frank, a member of the West Covina Mob who had been killed by Azusa 13 gang members three months before Tafolla was abducted. Ramos and Godine were members of the West Covina Mob. Trejo was a member of the El Monte Flores gang. [RT 477, 491-494, 495, 525-526, 633, 961].

Monique told Detective Guillermo Guerrero that Trejo had been saying "he was upset with [Tafolla] and that he was going to kick her ass and hold her hostage for her car."

Subsequently, Trejo asked to have the dogs put away so he could smoke in the backyard. After Monique put the dogs in the garage, Godine and Ramos arrived. All three defendants and Tafolla went into the backyard. Within minutes, Monique and Kelly heard a fight or a scuffle in the backyard. Because it was dark, they could not see exactly what was going on. Then the side gate opened. Monique looked out and saw Godine and Trejo dragging Tafolla from the backyard toward her car, which was parked in front of the house. Monique then saw Ramos drive off in Tafolla's car. [RT 952-958].

A few weeks afterward, Monique informed Detective Guerrero that later on the night of the abduction she received a phone call from Godine, who said Tafolla had been assaulted in order to protect Kelly and Monique from a planned attack by Azusa 13 gang members. Godine also told Monique to wash Tafolla's bloodstains from the cement in the backyard where the beating occurred. Monique tried to clean the area, but ended up covering it with paint. [RT 959-961].

2. *Defense evidence.*

Amber Demartinez was a student at Everest College who had some classes with Kelly. Demartinez's sister is married to Trejo's brother. Kelly told Demartinez that during a party at her house in August 2008, she had seen a Hispanic woman and a Black man beating up Tafolla. They put Tafolla into the trunk of a car and drove off. Then Kelly and Trejo got into another car and followed them. On the 57 Freeway, Tafolla leapt from the car and Kelly had to swerve to avoid

hitting her. Kelly did not stop because she was afraid of getting involved. Kelly said Trejo had not participated in Tafolla's abduction. [RT 1218-1230].

Trejo testified in his own defense. He first met Tafolla at a friend's house. After getting high together, they slept in an abandoned apartment and then drove around the next day looking for more methamphetamine. Later they went to Kelly and Monique's house in Covina. Trejo knew them because he had been friends with Monique's fiancé Frank, who had been killed by gang members a few months earlier. Trejo and Tafolla went to the Covina house because they needed a place where they could use drugs. When they first arrived the only people there were Kelly, Monique and their brother Mark. Tafolla was feeling dirty from sleeping in the abandoned apartment, so she decided to go home while Trejo stayed at the Covina house. [RT 1250-1257].

In the early evening, "a crowd of people rolled up in a van ... it was a bunch of Bloods ... guys, girls, Mexican, Black. It was all sorts." These people had been attending a gang social function held in Frank's memory. Tafolla rejoined Trejo at the Covina house. Later, they started to run out of drugs. Tafolla said she could get more drugs from her "homeys," but she would have to go alone. Trejo agreed and Tafolla left. Trejo started feeling tense because "some Black dudes" asked Monique why Tafolla kept going in and out of the house. [RT 1259-1262].

When Tafolla returned, they went to the backyard so Trejo could smoke a cigarette. There were other people

there, including a big African-American guy who had a large "M" tattooed on his neck. This man was not defendant Godine. This man made hostile remarks to Trejo and then grabbed a baseball bat. Trejo told Tafolla he was worried and she suggested they leave. She asked him to retrieve her things from the house. While Trejo was inside, he heard a loud noise. When he returned to the yard, Tafolla was unconscious on the ground. Trejo punched the guy standing next to him and a fight ensued. Kelly and Monique came outside and yelled at Trejo to leave. Trejo went to help Tafolla, who was crying and yelling. When he tried to walk Tafolla to the side gate, she fell face first onto the ground. Her mouth started to bleed and she passed out. [RT 1264-1270, 1279-1280, 1291].

Another fight started. Trejo saw a woman standing next to Tafolla's car. He asked her where Tafolla was and the woman said they had put her in the trunk. Trejo opened the trunk and found Tafolla bleeding but conscious. He told her he would take her home. However, other people got into Tafolla's car and drove off. Trejo jumped into Kelly's car. They argued because Kelly didn't want to follow Tafolla's car, but eventually she did. Trejo saw Tafolla fall out of the trunk onto the freeway. Kelly swerved to avoid her. Trejo told Kelly to go back, but she refused and ordered him out of her car. Trejo did not call the police about Tafolla's abduction because he feared retaliation from Bloods gang members. [RT 1271-1276, 1288-1289].

Ramos testified she arrived at Kelly and Monique's

house about 11:30 p.m. that night. Trejo was supposed to give Ramos a tattoo. Ramos went with Tafolla and Trejo to the 7-Eleven to buy cigarettes. When they returned, Ramos went into the backyard by herself to smoke. While there, she did not see a fight, anyone with a bat, or anything unusual. She left around midnight. Ramos did not recall having seen Godine that night or telling the police that she had. [RT 1336-1343].

Two weeks later Ramos left California because she was having problems with her mother; she went to stay with relatives in Texas. When her mother informed her a detective was looking for her in connection with a kidnapping, Ramos turned herself in. [RT 1344-1346].

Justin Corvetti, Godine's former parole agent, testified he had taken photographs of Godine in 2008. At that time there was no red "M" tattoo visible on Godine's neck, although Corvetti acknowledged such a tattoo could have been hidden by Godine's shirt collar. [RT 1208-1213].

3. *Rebuttal evidence.*

Detective Guerrero testified both Ramos and Trejo told him Godine was at the Covina house that night. According to Trejo, Godine did not trust Tafolla and wanted her to leave the party. Trejo told him to relax because Tafolla was okay. Later, Trejo, Godine, Tafolla and several unknown African-American males went to the backyard. Godine was swinging a bat. They all stood in a semi-circle and Godine walked up to Tafolla and hit her in the head with the bat. Ramos then came up and took Tafolla's car keys. Godine and another man

1   carried Tafolla to her car and put her in the trunk. Godine
2   got in and Ramos drove off. Trejo got into Kelly's car and
3   they followed. Trejo saw Tafolla jump onto the freeway, but
4   he did not stop for her because he didn't want to get
5   involved. [RT 1373-1385].
6   [Lodged Document ("LD") 7 at 2-7].

7       The jury was unable to reach a verdict on the attempted murder
8   charge, and the trial court declared a mistrial. [RT 2109; CT 374-
9   375]. Petitioner and his co-defendants were convicted of one count of
10  kidnaping during the commission of a carjacking. In a separate
11  proceeding, the trial court found true the allegation that petitioner
12  had suffered a prior serious felony conviction and petitioner
13  stipulated that he had served two prior prison terms. Petitioner was
14  sentenced to state prison for a term of twenty years to life. [RT
15  1631-1632, 3609-3610, 3613; CT 350, 589].

16      The California Court of Appeal affirmed petitioner's conviction,
17  and the California Supreme Court denied review. [LDs 7, 9].

18  **Petitioner's Contentions**
19  The petition alleges the following claims for relief:
20  1.    The evidence was insufficient to support petitioner's
21      conviction. [Petition at 5].
22  2.    The admission of extrajudicial statements violated
23      petitioner's Fifth Amendment right to due process and Sixth
24      Amendment right of confrontation. [Petition at 5].
25  3.    Petitioner joins in co-defendant Godine's and Ramos's claims
26      on appeal. [Petition at 5-6].

27  **Standard of Review**
28  A federal court may not grant a writ of habeas corpus on behalf

1  of a person in state custody

2      with respect to any claim that was adjudicated on the merits

3      in State court proceedings unless the adjudication of the

4      claim (1) resulted in a decision that was contrary to, or

5      involved an unreasonable application of, clearly established

6      Federal law, as determined by the Supreme Court of the

7      United States; or (2) resulted in a decision that was based

8      on an unreasonable determination of the facts in light of

9      the evidence presented in the State court proceeding.

10  28 U.S.C. § 2254(d). As used in section 2254(d)(1), the phrase

11  "clearly established federal law" includes only "the holdings, as

12  opposed to the dicta, of th[e Supreme] Court's decisions" at the time

13  of the state court decision. Howes v. Fields, 132 S.Ct. 1181, 1187

14  (2012) (internal quotation marks and citation omitted).

15      Under section 2254(d)(1), a state court's determination that a

16  claim lacks merit precludes federal habeas relief so long as

17  "fairminded jurists could disagree" about the correctness of the state

18  court's decision. Harrington v. Richter, 562 U.S. 86, 101 (2011)

19  (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). This is

20  true even where a state court's decision is unaccompanied by an

21  explanation. In such cases, the petitioner must show that "there was

22  no reasonable basis for the state court to deny relief." Harrington,

23  562 U.S. at 98.

24      Under section 2254(d)(2), relief is warranted only when a state

25  court decision based on a factual determination is "objectively

26  unreasonable in light of the evidence presented in the state-court

27  proceeding." Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011)

28  (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004), cert.

dismissed, 545 U.S. 1165 (2005)).

Finally, state court findings of fact – including a state appellate court's factual summary – are presumed to be correct unless petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); see Slovik v. Yates, 556 F.3d 747, 749 n. 1 (9th Cir. 2009).

**Discussion**

**1. Sufficiency of the evidence**

Petitioner alleges that the evidence was insufficient to support his conviction for kidnapping to commit carjacking because the carjacking facilitated the kidnapping, not the other way around. [Petition at 5].

The California Court of Appeal rejected this claim, reasoning as follows.[2]

> Defendants argue that, although the evidence proved they committed simple kidnapping (§ 207) and carjacking (§ 215), there was insufficient evidence they also committed kidnapping for carjacking (§ 209.5) because the carjacking had facilitated the kidnapping, rather than the other way around. Not so.
>
> The evidence showed Trejo kidnapped Tafolla in order to obtain her car, and that Godine and Ramos helped him carry out this plan. Both Kelly and Monique heard Trejo say he was going to "kick Tafolla's ass" and hold her hostage for her

---

[2] The California Court of Appeal's opinion is the relevant state court decision for purposes of section 2254(d) review. See Berghuis v. Thompkins, 560 U.S. 370, 378-380 (2010) (stating that where the intermediate state appellate court denied a claim on the merits and the state supreme court summarily denied discretionary review, the relevant decision under the AEDPA is the appellate court decision)

car. Kelly heard Trejo say he was going to burn Tafolla's car. All of this is exactly what happened. Godine and Trejo assaulted Tafolla in the backyard, dragged her to her car, threw her in the trunk, and left the Covina house with Ramos driving. When Tafolla's car was eventually recovered, it had been burned.

"Kidnapping during the commission of a carjacking can be analogized to kidnapping during the commission of a robbery. The California Supreme Court has held that 'where a kidnap[p]ing occurs after the actual perpetration of a robbery such kidnap[p]ing may be kidnap[p]ing for the purpose of robbery if it may reasonably be inferred that the transportation of the victim was to effect the escape of the robber or to remove the victim to another place where he might less easily sound an alarm.' [Citation.] Therefore, if there is substantial evidence that appellant intended the kidnapping to effect an escape or prevent an alarm from being sounded, his conviction for kidnapping during the commission of a carjacking must stand." (*People v. Perez* (2000) 84 Cal.App.4th 856, 860-861.)

The evidence here supported the conclusion defendants kidnapped Tafolla to prevent her from going to the police to report the theft of her car. As the Attorney General argues, "[a]n escape attempt that is poorly thought out is still an escape attempt," and the jury could have reasonably concluded that "if Tafolla was left at the house, appellants would most certainly be identified and apprehended." Such a conclusion is particularly appropriate given the nature of

this particular crime. "A 'direct offshoot of robbery,' carjacking 'was made a separate offense because of perceived difficulties with obtaining convictions under the robbery statute. [Citation.]' [Citation.] The Legislature was specifically concerned with the '"*considerable increase in the number of persons who have been abducted*, many have been subjected to the violent taking of their automobile and some have had a gun used in the taking of the car. This relatively 'new' crime appears to be as much thrill-seeking as theft of a car. If all the thief wanted was the car, *it would be simpler to hot-wire the automobile without running the risk of confronting the driver*. People have been killed, seriously injured, and placed in great fear, and this calls for a strong message to discourage these crimes."' [Citation.] Such concern for the abduction and safety of a driver or passenger is particularly evident in section 209.5, which provides for significant punishment if the victim is also moved a substantial distance with the risk of increased harm." (*People v. Medina* (2007) 41 Cal.4th 685, 697-698.)

There was sufficient evidence here that the defendants committed kidnapping in the commission of a carjacking in violation of section 209.5

[LD 7 at 10-11 (emphasis in original)].

In reviewing the sufficiency of the evidence in a habeas corpus proceeding, the test is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Lewis v. Jeffers</u>, 497 U.S. 764, 781 (1990) (emphasis in original,

14

internal quotation marks and citation omitted); <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979); <u>see</u> <u>Cavazos v. Smith</u>, 132 S.Ct. 2, 3-4 (2011) (per curiam) ("[I]t is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."). All evidence must be considered in the light most favorable to the prosecution, <u>Lewis</u>, 497 U.S. at 782, and if the facts support conflicting inferences, a reviewing court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." <u>Jackson</u>, 443 U.S. at 326; <u>see</u> <u>Bruce v. Terhune</u>, 376 F.3d 950, 957 (9th Cir. 2004) ("A jury's credibility determinations are therefore entitled to near-total deference under <u>Jackson</u>."). Finally, "[c]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." <u>United States v. Cordova Barajas</u>, 360 F.3d 1037, 1041 (9th Cir. 2004) (internal quotation marks, brackets and citation omitted).

Under California law, "[a]ny person who, during the commission of a carjacking and in order to facilitate the commission of the carjacking, kidnaps another person who is not a principal in the commission of the carjacking shall be punished by imprisonment in the state prison for life with the possibility of parole." Cal. Penal Code § 209.5(a). A defendant is guilty of kidnapping in the commission of a carjacking only if "the movement of the victim is beyond that merely incidental to the commission of the carjacking, the victim is moved a substantial distance from the vicinity of the carjacking, and the

movement of the victim increases the risk of harm to the victim over and above that necessarily present in the crime of carjacking itself." Cal. Penal Code § 209.5(b). Further, as the state appellate court noted, California courts have held that if "there is substantial evidence that [the defendant] intended the kidnapping to effect an escape or prevent an alarm from being sounded, his conviction for kidnapping during the commission of a carjacking must stand." <u>Perez</u>, 84 Cal.App.4th at 861.

Petitioner argues that the prosecution presented evidence suggesting that he and his co-defendants thought that Tafolla was setting up a drive-by shooting so they beat her and removed her from the scene. According to this interpretation of events, defendants' motivation for kidnapping Tafolla was simply to get rid of her, and the use of Tafolla's car was merely incidental to this purpose. [Petition at 5, attached Petition for Review at 5].

Although a rational jury could have viewed the evidence as petitioner suggests, it also could have concluded that petitioner and his co-defendants intended to take Tafolla's car and that they kidnapped her in order to perpetrate the carjacking by preventing her from reporting the crime to the police. In particular, as the state appellate court pointed out, there was evidence that before the crime, petitioner said that he was going "beat [Taffola] and hold her hostage for her car." [RT 468, 640, 942, 954]. Just as it was free to reject petitioner's testimony that he had nothing to do with the kidnapping or the carjacking, the jury was free to draw its own inferences from the evidence presented. This Court may not reweigh the evidence and reach a contrary result. <u>See</u> <u>Cavazos</u>, 132 S.Ct. at 3.

### 2. Admission of extra-judicial statements

Petitioner alleges that admission of evidence of Godine's extrajudicial statements to Monique violated petitioner's Fifth Amendment right to due process and his Sixth Amendment right of confrontation. [Petition at 5]. The factual basis for petitioner's claim is as follows.

After Monique testified that she did not remember telling Detective Guerrero about statements Godine made to her in a telephone call [see RT 703-705], the prosecution called Detective Guerrero in rebuttal. Detective Guerrero testified that a few weeks after the abduction, Monique said she had received a phone call from Godine after the defendants left with Tafolla that night. During this call, Godine told Monique: "[H]ey, we did this for you guys, you know, to protect you, ... we beat her because of you guys. [¶] At which time [Monique] said ... I don't understand, what are you talking about? [¶] And then [Godine] said something to the effect that ... we believe that they were going to come over and harm you guys or attack you guys, referring to a different gang, so that's why we did what we did." [RT 959-960]. Monique told Detective Guerrero that after she replied, "I think you got things confused, I didn't see a problem that night," Godine became "upset and said, hey, you ought to be thankful for what we did, we did this because of you, you need to go back and get rid of the blood or some of the evidence." [RT 960-961].

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. The Supreme Court has held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear

at trial unless he was unavailable to testify, and the defendant had ... a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 53-54 (2004). When, however, "the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." Crawford, 541 U.S. at 59 n. 9; see California v. Green, 399 U.S. 149, 158 (1970) (holding that the Confrontation Clause "is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination"). Even when a witness gives "testimony that is marred by forgetfulness, confusion or evasion," the Confrontation Clause is generally satisfied so long as the defense "is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." Delaware v. Fensterer, 474 U.S. 15, 22 (1985).

Here, the state court held that Godine's statements were admissible as declarations against interest [RT 695-698; LD 7 at 15], and, as petitioner conceded, Godine's statements to Monique do not implicate the Confrontation Clause because they were made to an acquaintance and were not "testimonial." [See LD 7 at 15]. This conclusion was not contrary to clearly established federal law. See Delgadillo v. Woodford, 527 F.3d 919, 927 (9th Cir. 2008) (holding that a state court's conclusion that declarant's statements to her coworkers were non-testimonial was neither contrary to, nor an unreasonable application of, Crawford); United States v. Brown, 441 F.3d 1330, 1360 (11th Cir. 2006) (finding that a "private telephone conversation between mother and son, which occurred while [the mother]

was sitting at her dining room table with only her family members present" was not testimonial), cert. denied, 549 U.S. 1182 (2007); Ramirez v. Dretke, 398 F.3d 691, 695 & n. 3 (5th Cir.) (holding that a co-defendant's out-of-court statement to the person he was staying with that the petitioner had hired him to kill a fireman was not testimonial since it was "made outside any arguably judicial or investigatory context"), cert. denied, 546 U.S. 831 (2005).

The state appellate court also concluded that the Confrontation Clause was inapplicable to Monique's statements to Detective Guerrero because Monique testified at trial and was subject to cross-examination. It emphasized that the jury had the opportunity to assess Monique's demeanor as a witness and to evaluate the credibility of her extra-judicial statements, notwithstanding her testimony that she did not recall Godine's phone call. [LD 7 at 15-16].

The state court's determination of petitioner's Confrontation Clause claim was neither contrary to, nor an unreasonable application of, clearly established federal law. As the state court correctly pointed out, Monique was present at trial and testified under both direct and cross-examination. Despite the fact that Monique was arguably evasive when she testified that she did not recall the phone call or having told Detective Guerrero about the phone call, she nevertheless was available to the defense for cross-examination. The jury was able to evaluate her demeanor and credibility as to both her trial testimony and her prior inconsistent statements. In sum, it was not unreasonable for the state court to conclude that Monique's testimony that she could not recall having such a conversation with Godine, that she thought she would remember such a conversation if it had occurred, and that she could not recall telling Detective Guerrero

about the alleged conversation with Godine, did not render her unavailable for cross-examination such that admission of her statements violated petitioner's right of confrontation. See United States v. Owen, 484 U.S. 554, 564 (1988) (stating that even memory loss does not render a witness unavailable for Confrontation Clause purposes); United States v. Valdez-Soto, 31 F.3d 1467, 1470 (9th Cir. 1994) ("We are aware of no Supreme Court case, or any other case, which holds that introduction of hearsay evidence can violate the Confrontation Clause where the putative declarant is in court, and the defendants are able to cross-examine him."), cert. denied, 514 U.S. 1113 (1995).

Petitioner's due process claim fails for several reasons. First, despite his conclusory mention of "due process," petitioner essentially challenges the state court's interpretation or application of California evidentiary law, a challenge which does not justify relief in a federal habeas corpus action. See 28 U.S.C. § 2254(a); Swarthout v. Cooke, 562 U.S. 216, 219 (2011) (per curiam); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Second, no Supreme Court precedent has made clear that admission of overly prejudicial evidence can constitute a due process violation warranting habeas corpus relief. See Wright v. Van Patten, 552 U.S. 120, 126 (2008) (per curiam) (stating that where no decision of the Supreme Court squarely addresses an issue, it cannot be said that the state courts unreasonably applied clearly established federal law for purposes of 28 U.S.C. § 2254(d)); Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) ("The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when

20

constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.") (citation omitted); see also Estelle, 502 U.S. at 75 n. 5 ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."). Consequently, petitioner cannot demonstrate that the state court's decision was contrary to or an unreasonable application of clearly established federal law. See, e.g., Mejia v. Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008) (noting that, because the Supreme Court has never reached the issue, a claim that introduction of evidence regarding a prior similar offense violates due process is "squarely foreclosed]"), cert. denied, 555 U.S. 1117 (2009); Alberni v. McDaniel, 458 F.3d 860, 863–867 (9th Cir. 2006) (denying the petitioner's claim that the introduction of propensity evidence violated his due process rights under the Fourteenth Amendment because "the right [petitioner] asserts has not been clearly established by the Supreme Court, as required by AEDPA"); Zuniga v. Virga, 2015 WL 4617185, at *17 (E.D. Cal. July 31, 2015) (finding that a claim of wrongful admission of evidence was not cognizable under the AEDPA because "there are no Supreme Court decisions 'clearly establishing' that the erroneous admission of spontaneous statements as exceptions to the hearsay rule violates due process").

Finally, even if petitioner's claim is subject to de novo review,

21

petitioner still is not entitled to relief.[3] Petitioner "bears a heavy burden in showing a due process violation based on an evidentiary decision. Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir.) as amended on reh'q, 421 F.3d 1154 (9th Cir. 2005). The erroneous admission of evidence violates due process only "if there are *no* permissible inferences the jury may draw from it." (quoting Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991)) (emphasis original). Further, federal habeas corpus relief is not available unless petitioner shows that the error had "a substantial and injurious effect on the jury's verdict." Plascencia v. Alameida, 467 F.3d 1190, 1203 (9th Cir. 2006) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)).

Petitioner does not dispute that Godine's statements to Monique were relevant. They tend to show that, contrary to petitioner's testimony, Godine was involved in the crime and they also implicitly suggest that all three co-defendants acted together with a common motive. Because the evidence was relevant, petitioner has not met his burden of demonstrating that admission of the evidence rendered his trial fundamentally unfair.

Moreover, considering the strength of the evidence against

---

[3] Petitioner presented his due process claim to the California Court of Appeal [LD 4 at 32], but that court did not specifically address it. Although the state court's decision probably constitutes an adjudication on the merits of petitioner's due process claim, see Johnson v. Williams, 133 S.Ct. 1088, 1091 (2013) (if a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court presumes, subject to rebuttal, that the federal claim was adjudicated on the merits), the Court need not resolve the appropriate standard of review in this case, because petitioner's claim fails under the more generous de novo standard. See Berghuis v. Thompkins, 560 U.S. 370, 390 (2010) ("Courts can ... deny writs of habeas corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review").

petitioner – in particular, Tafolla's testimony that petitioner punched her and pushed her back into the trunk of her car before she was driven away – he cannot demonstrate that the admission of Godine's statements, even if erroneous, had a substantial and injurious effect on the jury's verdict.

**3. Co-defendants' claims**

Petitioner alleges that he "joins in the contentions of co-appellants." [Petition at 5-6]. Petitioner, however, fails to identify any specific "contentions," and the record includes nothing indicating that his co-defendants raised any claims other than those discussed above.

**Conclusion**

For the foregoing reasons, the petition for a writ of habeas corpus is **denied**.

**It is so ordered.**

Dated: ___August 24, 2015_____

_____
Andrew J. Wistrich
United States Magistrate Judge